## NATIONAL SURETY CORPORATION v. MICHIGAN FIRE & MARINE INS. CO. et al.

### Civil Action No. 915.

District Court, D. Minnesota,
Fourth Division.

Aug. 31, 1944.

Durham & Swanson, of Minneapolis, Minn., for plaintiff.

Bowen & Bowen, of Minneapolis, Minn., for defendants.

NORDBYE, District Judge.

Each of the defendant fire insurance companies issued to one M. B. Lytle, who did business as the Harbor Elevator in Minneapolis, Minnesota, a fire insurance policy covering—

"* * * grain and seeds * * *; and on coal, flour, feed, produce, sacks, bags, twine, seed grain, wool, hides, salt, and fuel, and on such other merchandise as is usually bought or sold by country grain elevators; and, provided the insured is liable therefor, this policy shall also cover such merchandise held in trust, or on commission, or sold but not delivered; all insured's own or held by insured in trust, or on commission, or sold but not removed, or on storage if in case of loss the insured is liable therefor, while contained in the elevators and warehouses at locations named in the schedule hereto attached, or within 100 feet of said elevators and warehouses and other structures, * * *."

During the time in which these policies were in force, Lytle stored grain for the Commodity Credit Corporation at the Harbor Elevator. In January, 1941, the six floors of the mill portion collapsed, causing a large part of the corn to be precipitated into the sub-basement. When the contractors were engaged in repairing the damage, and on March 31, 1941, a fire occurred in the sub-basement where a part of the grain owned by the Commodity Credit Corporation had remained ever since the collapse of the mill floors. A portion of this grain was burned and damaged by fire, water and smoke. Under his contract with the Commodity Credit Corporation, Lytle became liable for the loss or damage to any grain. The plaintiff, who was surety for Lytle's performance of his contract with the Commodity Credit Corporation, paid the latter their fire loss, together with other losses not relevant here. On April 4, 1941, Lytle assigned to plaintiff all of his rights to the proceeds of the insurance policies involved herein on account of the loss sustained by the fire of March 31, 1941. Later on, plaintiff assigned its rights to the proceeds to the Commodity Credit Corpo-

ration, which in turn reassigned its interest back to the plaintiff. Plaintiff now seeks to recover from the defendants the loss which occurred by reason of the fire referred to. A second fire occurred on May 7, 1941, but that is only pertinent to the question of fraud, which is later discussed.

A reading of the policy seems to leave little doubt that the parties to the insurance contract intended that Lytle should be insured against loss of his own grain and other commodities and only against his liability by reason of any loss of grain and other commodities which he might hold for others in trust, commission, or storage. It appears that Lytle himself owned no grain at all in this elevator when the fire occurred. All of the grain, consisting of some 131,000 bushels, belonged to the Commodity Credit Corporation. This grain was held in storage subject to a certain uniform storage agreement which had been entered into between Lytle and the Commodity Credit Corporation, and which made Lytle responsible for the loss of any grain which was stored with him regardless of the cause of the loss.

The question therefore arises as to whether or not, under the provisions of these policies, these defendants are responsible to the insured by reason of his liability to the Commodity Credit Corporation for the corn which was destroyed and damaged by fire. The difficulty seems to arise in determining the definition or interpretation to be accorded to the word "liable"; that is, the insurance did not cover any merchandise held by Lytle in trust or on storage unless he was "liable therefor." The general word "liable" does not indicate of itself upon what the insured's liability must be predicated. Defendants urge that the policy only protects the insured against his tort liability. There is no liability on the part of a warehouseman under the statutes of Minnesota for loss by fire in absence of the bailee's negligence, and neither is there any liability for loss by fire under the common law in absence of negligence. But the plaintiff contends that both contract and tort liability are encompassed and embraced within the terms of this policy; that is, it urges that the provisions of the policy as to the coverage of merchandise held in trust or on storage, where the warehouseman is liable therefor, is so general and broad that there is no justification for any limitation on the term "liable" when the insurer itself selected such language in stating the coverage to be afforded by the policy. The obligation of the insurer must be determined solely from the provisions of the policy. No other evidence as to the intention of the parties or circumstances relating to the issuance of this insurance was before the Court; that is, neither party has attempted to prove by parole evidence the coverage that the parties intended if such intention was in any way manifested by words or actions prior to or simultaneously with the issuance of the policy.

It seems apparent that the policy is indefinite as to the scope of the liability of the insured which it assumes to cover. If it is limited to the common law or statutory liability of a warehouseman, apt language could easily have been used to indicate such limited coverage. Generally, any ambiguity in the provisions of an insurance policy must be construed most favorably to the insured. No good reason is suggested why that principle should not be employed in the present situation. Moreover, it will be noted that the policy refers to various relationships which might arise between the insured and others with reference to certain types of merchandise; that is, the policy refers to merchandise which the insured may have on commission or in trust or storage, or merchandise which he may have sold and the same had not been delivered or removed by the purchaser at the time of the fire. It is not unlikely that, by reason of some of the relationships contemplated by the policy, the insured might become liable to such owners upon loss by fire even though the insured was in no way responsible for the fire. Such liability might arise, for instance, by virtue of a bond given by a warehouseman to the owner, or a contract to indemnify the owner in the event the goods were lost or destroyed for any reason during the time they were in possession of the warehouseman. In other words, in view of the relationship between the warehouseman and others as contemplated by this policy, it is entirely possible, if not probable, that the ordinary liability of a warehouseman might be extended by reason of special agreements or circumstances. The present situation whereby Lytle became liable to the Commodity Credit Corporation is not necessarily beyond the scope of coverage which the provisions of the policy contemplated. Again, it may be repeated that there is a complete absence of any provision in this

policy which indicates that the insurer intended only to cover the insured's liability as a warehouseman under the State statutes or under the common law in case of loss by fire. The fact that the insured might by special contracts render himself liable for all grain held in trust or in storage so as to result, as a practical matter, to a coverage of the grain itself, rather than the liability for the loss of the grain, does not militate against the reasonableness of the construction urged by the plaintiff. Moreover, there is no reason to assume that any injustice would result to the insurer if the warehouseman took it upon himself to give special contracts to all the bailors who may have grain on storage. The premium on this policy was adjustable to the amount of grain covered. At the close of each month, the insurance premium was to be redetermined depending upon the daily average of merchandise on hand during the preceding month. Presumably, grain on hand would cover not only the grain owned by the insured, but also grain in storage or in trust for which the warehouseman was liable.

The facts of this case are clearly distinguishable from the cases relied on by the defendants. In Minneapolis, St. P. & S. S. M. Ry. Co. v. Home Ins. Co., 1893, 55 Minn. 236, 56 N.W. 815, 22 L.R.A. 390, the insurance issued therein was limited to the liability of the insured as a carrier and warehouseman by specific language. There was no other liability of the carrier by contract or otherwise. It is significant to note that the carrier sought to establish additional liability by way of parol evidence to the effect that it had had a collateral contract with the shipper to procure insurance on the property of the shipper which was lost by fire. The Court, however, refused to receive the parol evidence to enlarge the liability of the carrier as evidenced by the bills of lading. The language of Justice Mitchell regarding special contracts of liability of a warehouseman not being within the scope of the coverage of the policy must be read and considered in light of the particular facts of that case. It was clearly evident by the bills of lading that the liability covered by the policy was to extend only to the liability of the insured as a carrier or warehouseman. In the instant situation, however, there are no facts or competent circumstances which in any way indicate that the term "liability of the insured" is so limited.

In Orient Ins. Co. v. Skellet Co., 1928, 8 Cir., 28 F.2d 968, it appeared that the Skellet Co. had no contract or agreement which extended its liability beyond that of a warehouseman; consequently, there was no coverage on goods held in storage when the evidence indicated that the fire resulted through no fault of the Skellet Co.

In Millers' Mutual Fire Ins. Ass'n v. Warroad Potato Growers Ass'n, 1938, 8 Cir., 94 F.2d 741, 742, it appears that the policy in that case contained language limiting the coverage as follows: "if in case of loss the insured is legally liable therefor." The court in construing that language held that there was no coverage on potatoes held in storage by the Association where under the evidence the Association was not liable to the bailors for the loss of such potatoes.

Giving to the language in this policy which the insured itself has selected the ordinary, usual, and normal construction which the words connote, it would seem that the liability of Lytle to the Commodity Credit Corporation for the grain belonging to the latter and which was in part destroyed by the fire, is covered by the provisions of the policy. It is a significant fact that the only grain in the elevator for which this policy was obtained by Lytle consisted of the corn which the Commodity Credit Corporation had stored with him. Granted that this policy was probably framed to cover the ordinary business conducted by a country elevator and that, under such circumstances, contracts such as we have here may not be common, it must be remembered that the policy was written by the defendants for Lytle knowing that he was conducting his business as an operator of a terminal elevator—the exception to such coverage is stricken out of this policy.

The defendants contend that there is no liability on this policy because of fraud. Among other contentions, it is asserted that no recovery can be allowed on these policies because the plaintiff wilfully and knowingly, with intent to defraud, padded its claim. It appears that the plaintiff has claimed at all times that the corn in question was worth 66 cents a bushel. The evidence does indicate that the market value of No. 1 corn on the day of the fire was 66 cents, but that value is based on the assumption that the seller will have available for the purchaser the so-called transit freight receipts, which enable the purchas-

er to ship the grain at the transit rate. The evidence indicates that, without transit bills, the market value would be some 10½ cents per hundredweight, or about 5.88 cents, per bushel less. The transit bills on this corn were missing, and consequently the corn did not command the market price of 66 cents. It is true that plaintiff did demand not only in its proof of claim, but also on trial, recovery on the basis of 66 cents per bushel. Moreover, it may be gathered that, at least before the trial, plaintiff's representatives were informed that the market price quoted required the accompaniment of transit bills to the purchaser. However, it does appear that a substantial part of the corn salvaged and sold after the fire as No. 1 did obtain a price of 66 cents per bushel without transit tickets. It was apparently sold to local dealers or to those who intended to truck the grain to other points, and consequently such purchasers were not concerned with transit bills. Moreover, plaintiff points out that the Commodity Credit Corporation made a claim against it and obtained a settlement on the basis of 66 cents a bushel without transit tickets. It seems quite evident that, if a seller were fortunate enough to contact a local buyer who intended to use the corn in this market, he probably would have been able to dispose of No. 1 corn without transit tickets and obtain the full market price. Strictly speaking, however, the market price on this corn was 10½ cents per hundredweight less than 66 cents because of the absence of the transit tickets. Plaintiff apparently sought to recover in its proof of claim and on trial a price for the damaged corn which was reflected in the favorable sales obtained by the Brooks Elevator Company, which handled the corn remaining in the elevator after the fire and were able to sell a substantial amount of the corn at 66 cents a bushel without transit tickets. In view of these circumstances, it does not seem fair and just to characterize the plaintiff's excessive claim as fraudulent. It is entirely probable that it assumed that there was a question of fact of some substance, at least, to be determined by the Court as to the yardstick that should be used in arriving at a fair market value of this corn. It is entirely probable that a user or processor of corn in this locality who was in need of corn on March 31, 1941, would have paid the quoted market price of 66 cents a bushel, and the mere fact that plaintiff assumed to assert its value on the most favorable basis should not condemn the claim as fraudulent so as to vitiate the policy. Soler & Co. v. United Firemen's Ins. Co., 299 U. S. 45, 57 S.Ct. 54, 81 L.Ed. 30.

True, as stated in Columbian Ins. Co. v. Modern Laundry, 8 Cir., 277 F. 355, 360, 20 A.L.R. 1159:

" * * * where the insured knowingly and willfully makes a false statement of or regarding a material fact in its proof of loss, or in its testimony regarding the value of the property insured, or the loss or damage thereto by fire, the intention to deceive the insurer is necessarily implied as the natural consequence of such act."

But the facts herein will not justify such implications. It should be remembered that the determination of the market price of grain in light of the availability of freight tickets is a matter which is not readily appreciated by those who are not in the grain trade. In fact, the law as to when freight tickets may be used in the payment of freight where grain has been stopped in transit is not entirely clear. In light, therefore, of all the circumstances related, it would seem that the claim made by plaintiff as to the market value of this grain should not be stigmatized as one which was made knowing the same to be false.

There is only one other question concerning fraud which requires consideration. The policy provides: "The policy shall be void * * * if the insured shall make any attempt to defraud the company either before or after loss." It also requires that proofs of loss be filed with the insurer and that within sixty days after filing of the proofs of loss the insurer must pay the insurance or replace the property. The evidence is undisputed that, after the first fire, Lytle set fire to this elevator on May 7, 1941, and a substantial fire resulted. He was indicted and convicted for arson. Proofs of loss for the fire of March 31st, the first fire, were not perfected until long after the May 7th fire. The defendants therefore raise the question whether Lytle's fraud of May 7th, which clearly rendered these policies void as to any claims arising from the May 7th fire, prevents the plaintiff from recovering for the March 31st fire losses.

The fact that on April 4, 1941— thirty-three days prior to the May 7th fire —the plaintiff received the assignment of Lytle's claims on the March 31st fire would not seem to settle the question. Lytle could assign only what he possessed.

Therefore, if his rights to the insurance proceeds for the March 31st fire were defeated by his subsequent fraud as to another claim, the rights he assigned to plaintiff would also be subject to that condition. The problem resolves itself into the question, Does the fraud of May 7, 1941, operate retroactively so that legitimate claims arising prior to that date are rendered unenforcible?

■ The question seems to require a negative answer. Defendants contend, or assume, that filing of the proof of loss by the insured is the act or fact which creates the insurer's liability. But Gendreau v. State Farm Fire Ins. Co., 1939, 206 Minn. 237, 288 N.W. 225, clearly contradicts that position. Speaking of the identical statutory standard form of fire insurance policy as is present in the instant case, the court held, at page 239 of 206 Minn., at page 225 of 288 N.W.: "The policy is such that, in case of loss thereunder, nothing more (e.g., proofs of loss) was needed to mature the cause of action for the insured." And the court then proceeded to apply the statute of limitations from the time the loss occurred. See Smith & Wyman Co. v. Carlsted, 1925, 165 Minn. 313, 316, 206 N.W. 450; compare Paull v. Columbian Nat. Fire Ins. Co., 1927, 171 Minn. 118, 213 N.W. 539. The rule still is the law of Minnesota.

■ Consequently, there seems no doubt that the insured's rights to collect the insurance for the March 31st fire existed before the fraud of May 7th caused the policy to become void. That right is not dependent upon the filing of proof of loss. The proof of loss is filed for the purpose of permitting the insurer to determine whether it is liable, Rein v. New York Life Ins. Co., 210 Minn. 435, 299 N.W. 385, not to give rise to its liability. Cf. Wold v. State Mutual Life Ins. Co., 1936, 198 Minn. 451, 270 N.W. 150. That is, a proof of loss does not go to the substantive existence of the liability under the policy. It goes to the procedure by which the substantive rights are and can be enforced and acknowledged. But unless excused or waived, the proof of loss must be filed, of course, in order for the insured to perform his part of the insurance contract and to acquire the right to sue on the liability arising from the loss. Gies v. Bechtner, 12 Minn. 279.

■ Moreover, a reading of the entire paragraph in which the condition subsequent is contained, would seem to fully justify the construction that there must be a relationship, so to speak, between the breach and the loss which is sought to be enforced under the insurance policy. It will be observed that it is provided in this policy that it shall be void upon the happening of several events, that is, if the insured, without the consent of the company, shall make any other insurance on the property—if the property shall be sold or the policy assigned—if the premises shall become vacant by the removal of the owner or occupant for thirty days without assent of the insurer—if the insured shall make any attempt to defraud the company, either before or after the loss—if gunpowder, camphene, benzine, etc., shall be kept or used by the insured on the premises, subject to certain exceptions.

It must be apparent that, if there were a fire in the premises covered by this policy, and after the fire had occurred the insured vacated the premises or sold the property, or kept any of the prohibited articles in the premises, the policy would not be voided as to the loss which had occurred before the breach of the conditions subsequent. Indeed, it would be unconscionable and clearly contrary to the intent of the parties to deny recovery under such a policy under such circumstances after the loss had occurred. Assume, for instance, that two separate and distinct fires occurred months apart, each of which partially destroyed a building covered by the policy in question. Assume further that, as to the second fire, the owner wilfully and fraudulently padded his claim in making out a proof of loss, and hence the company had an absolute defense as to any recovery as to the second fire. Could it be successfully asserted that, under the provisions of this policy, the same defense could be also asserted as to a claim for recovery by reason of the first fire and as to which there was no fraud in the making out of the proof of loss? It would seem that the question propounded suggests its own answer and that there can be no serious doubt as to the right of the insured to enforce the policy as to the first fire even though the policy became void by reason of the subsequent fraud.

While the clause in question provides that the policy shall be void if fraud occurs before or after the loss, a reasonable construction would suggest that, if there is no breach of a condition precedent or subsequent at the time of the loss, then

a breach of a condition subsequent after the loss will not void the policy unless the fraud or breach pertains to the loss which had already occurred; that is, fraud after loss should not disturb vested rights unless it concerns the enforcement of such rights. It may be observed that the policy in question merely provides that it shall be void in the event of fraud before or after loss, and there is an absence of language which suggests an intention to void the policy retroactively unless the subsequent fraud pertains to the particular loss which is being enforced.

The cases which throw any particular light on the immediate question do not appear to be plentiful. However, it may be noted that, where a policy is cancelled, subsequent to a loss but prior to recovery for the loss, it does not operate retroactively so as to deny the claim thereunder which already exists. Baker v. Citizens Mutual Fire Ins. Co., 1883, 51 Mich. 243, 16 N.W. 391; Hutchins v. United States Automobile Ins. Exchange, 1927, 170 Minn. 273, 212 N.W. 451. Also, where a policy becomes void because of a breach of warranty or operation of a condition subsequent, no premiums are recoverable because the policy is not void from the beginning. Parsons, Rich & Co. v. Lane, 1906, 97 Minn. 98, 106 N.W. 485, 4 L.R.A.,N.S., 231, 7 Ann.Cas. 1144.

It may be pointed out that there is no evidence herein which would justify a finding that the setting of the fire of May 7th was perpetrated with the design or intent to affect, increase, or prejudice the insurance companies' rights or position as to the first fire. That is, the evidence would not justify a finding that Lytle intended or that his unlawful acts did in any way prejudice defendants' rights as to their liability under the policies by reason of the first fire.

 It seems reasonable to conclude, therefore, that if the breach of the condition subsequent is entirely divorced from and bears no relation whatsoever to a fire which has already occurred, and a claim resulting thereby has already accrued under the policy, the clause in question does not cut off the claim already existing. It is the only conclusion which seems in harmony with the evident intention of the parties, it is a reasonable construction of the language used, and this view will not bring about absurd and unconscionable results. These views also answer defendants' contention that plaintiff is guilty of fraud which vitiates its rights to pursue its claim herein by reason of the fact that it brought a suit against the defendants for loss occasioned by the second fire, which suit has now been dismissed, when it knew or should have known that it was incendiary.

 This brings us to the question of damages. Obviously, plaintiff can recover only the losses and damages caused by the fire, for those types of losses and damages are the only ones included within the coverage of the various policies. A review of the evidence shows that all of the items for which plaintiff seeks reimbursement were not caused by the fire, and as to others, no recovery can be allowed because of the lack of satisfactory evidence to sustain them.

As previously noted, part of the mill section of the Harbor Elevator collapsed prior to the March 31st fire, upon which this action is based, and the grain contained on and adjacent to the collapsed portions fell to the sub-basement. The sub-basement was musty and damp and unsuitable for the storage of corn or any other grain. So removal of the corn was necessary if it were to retain any of its value. Likewise, the condition of the superstructure in which the six floors collapsed was such that the corn's removal from the uncollapsed part of the superstructure was required as a matter of necessity and security. Long prior to the fire, Lytle and the plaintiff arranged to have the corn removed from the Harbor Elevator, and part of it actually had been removed prior to the fire. Consequently, the March 31st fire really had nothing to do with the removal of the corn, for the removal was ordered and performed without reference to the fire's occurrence. The corn would have been removed regardless of the fire, for the collapse required its removal as a matter of necessity. Even the corn which was not damaged at all by the fire or its incidents was removed. Removal of all corn was planned from the beginning of operation shortly after the collapse. Because of the conditions caused by the collapse, the corn could not be stored any longer in the building. Moreover, Myles L. Kane, who supervised the removal of the corn, testified that the fire did not even increase the cost of removing it. The cost of removal would have been the same even if the fire had not occurred, he declared. Consequently, it seems evident that the collapse, not the fire, caused the remov-

al of the corn and the removal expenses, and that such expenses cannot be charged against the fire insurance. The fire was not the cause of that loss.

Likewise, plaintiff cannot recover all the loss suffered by price reductions necessitated because of the grain's being wet, or containing what is commonly called C.O.F. O. (commercially objectionable foreign odor). All the grain which became wet seems to have been in the sub-basement. The evidence shows that this part of the aged structure was damp and musty, and before the authorities would permit salvage work in any part of the building, they required Lytle to brace it. This was done by placing two heavy beams through two small sub-basement windows. The beams extended across and were anchored on the opposite side of First Street, which ran next to the Harbor Elevator. Consequently, when water ran in the street from rainfall, some of it was diverted, and following the obstruction it ran along the beams and into and on the corn in the Harbor Elevator sub-basement. Although "bridges" were built over the beams and sand was used, the evidence leaves no doubt that the water did enter the sub-basement and substantially moistened some of the grain both before and after the March 31st fire. Lytle, Kane and Henderson all testified to the water's entry. Consequently, it is apparent that all of the wet grain which was taken from the sub-basement was not the result of the fire. Some of it was caused by the fact that the collapse necessitated additional support for the building, and the additional support diverted the street water into the grain. Therefore, the fire losses and the street water in the grain have no relation whatsoever on the evidence presented.

Concededly, however, water was used to extinguish the fire. An estimate was made that some 800 bushels of corn in the sub-basement were involved in the fire or the fire area. Undoubtedly, there was smoke damage to some of the corn. The evidence indicates that the smoke was so dense in the sub-basement that the firemen were required to wear smoke masks in order to enable them to enter that part of the building. But the computation of damage presents an extremely difficult question. It is quite impossible to determine the number of bushels of corn which were wetted by the water from the fire hose, as distinguished from the corn which became wet or moist from rain water. Only 50 gallons of water were used by the Fire Department. This is not a mere estimate; it reflects the meter readings on the fire engine. Moreover, the attempt to determine the amount of corn damaged by smoke presents many practical difficulties. The evidence indicates that a large amount of the corn salvaged was subject to a certain amount of C.O.F.O. Whether this damage arose partially from the smoke, or partly or entirely from the collapse of the aged structure is entirely conjectural. The evidence indicates just as strongly in favor of the conclusion that such odors resulted from the collapse. The elevator was very old. When the collapse occurred, the old lumber and other material fell into and mixed with the corn. The sub-basement was not suitable for storing corn. It was damp and musty. Undoubtedly, such conditions caused or contributed to the odors which reduced the market value of this corn. Finally, it should be noticed that no witness has identified the C.O.F.O. as the result of smoke.

Reference may be made to the evidence which indicates that some 4,200 bushels of corn were apparently washed down the sewer hole in the sub-basement. Whether this was caused by water from the fire hose or water coming in from the street by reason of rainfall, or on account of water from both sources, is not clear from the evidence. Certainly, it is significant that only 50 gallons of water were used by the Fire Department. That amount of water would hardly have occasioned all of this loss. It would seem that the state of the evidence as to this item of damage leaves the matter in the realm of speculation. The witness Kane did give evidence at the State trial which is inconsistent with his present testimony. But Kane was the plaintiff's witness and the burden of proof rests upon the plaintiff. Any reasonable doubts must be resolved against it. Foot v. Yorkshire Fire Ins. Co., 1939, 205 Minn. 478, 482, 286 N.W. 400.

It does seem sound, however, to consider as recoverable damage some four cars of salvaged corn which the witness Kane characterized as smoke damaged. He stated that some four or five cars were so damaged. No doubt there was some water damage to this particular corn as well. It may be urged that, in light of the confusion which exists as to the amount of water damage caused by the fire, the expense of drying, or the diminution of the value of

this corn on account of being wet as well as having a smoke odor, should not be chargeable to the defendants. At first blush, this argument may seem to have merit. However, in trying to effect substantial justice in this matter, it would seem that the item of water damage as to these four cars should not defeat plaintiff's recovery. Certainly, some water damage resulted. The amount of additional expense in reconditioning the corn by reason of water damage was probably not substantial. The corn had to be reconditioned by reason of smoke damage regardless of the water damage. In that no specified damage is allowed to plaintiff herein by reason of corn being wetted by water from the fire hose, the part of the damage which the water figured in the four cars in question is not unfairly charged to the defendants. We commence, therefore, with the minimum number of cars, to wit, four, which were stated by Kane to be smoke damaged. In absence of other proof, it is fair to select the four cars which sold for the highest price. These cars are noted on plaintiff's Exhibit I, and are as follows:

car. That is, the market price of No. 1 corn would be 66 cents per bushel less 10½ cents per hundredweight. This sum, minus the price which was received for the cars' contents, would reflect the damage. However, in this connection, before the four cars could be sold for that price, it was necessary that the same be reconditioned. The evidence indicates that the reconditioning of this corn reasonably cost five cents per bushel. There were some 4,750 bushels of corn, and at five cents a bushel the cost of reconditioning would amount to $237.50.

As before stated, there were some 800 bushels of corn involved in the fire. The evidence indicates that certain damaged corn was sold for $217.56. The amount sold, however, was 1129-16 bushels. Apparently, the corn thus sold was sort of a clean-up after the first fire and included burned corn and presumably other corn which could not be reconditioned. However, there is no satisfactory evidence that the corn in excess of 800 bushels was damaged by the fire. In computing damage, therefore, in regard to the 800 bushels, we

| Car No. | Salvage Corn | | |
|---|---|---|---|
| 36032 | 60,000# | 1071–24 Bu. at 50¢ | $485.73 |
| 5425 | 60,000# | 1071–24 Bu. at 42¢ less 10 1/2¢ cwt. | 387.00 |
| 15072 | 66,000# | 1178–32 Bu. at 42¢ less 10 1/2¢ cwt. | 425.70 |
| 132458 | 80,000# | 1428–32 Bu. at 42¢ less 10 1/2¢ cwt. | 516.00 |

In figuring the market value of the corn in question as of March 31, 1941, it seems clear that the lack of freight tickets must be calculated against plaintiff because, although it does appear that Kane, in absence of freight tickets, was able in some instances through fortuitous circumstances to obtain a price substantially the same as the market price, one nevertheless must conclude that the market price of this corn was 66 cents per bushel less 10½ cents per hundredweight. That is, whether the particular corn would have been sold to those who might use the same for local consumption, or to be transported by trucks, and therefore such purchasers would not be concerned with the freight tickets, is a matter of pure speculation. Considering, therefore, the market value of this corn as of March 31, 1941, and the price received for these four cars of salvaged corn, as reflected in plaintiff's Exhibit I, it appears that the difference between such sums amounts to $990.84. This figure is obtained by determining the loss suffered on each

can commence with the market price of 66 cents per bushel less 10½ cents per hundredweight, and this results in a market value of the corn as of March 31st in the amount of $480.96. The proportion that 800 bushels bears to 1129-16 bushels must be considered in determining what proportion of the $217.56 which was received for the damaged corn shall be credited as a recovery on the 800 bushels. Taking 800/1129 of $217.56 results in a figure of $154.16, and this deducted from $480.56 leaves $320.80, which reflects the recoverable damage growing out of the damage to the 800 bushels referred to.

In view of these premises, therefore, plaintiff's recoverable damage may be summarized as follows:

For burned corn............... $ 326.80
For smoke damaged corn....... 990.84
Reasonable cost of reconditioning
 four cars of salvaged corn.... 237.50

Total recoverable damages.. $1,555.14

The amount and proportion of this sum for which each defendant is liable according to its policy obligations are as follows:

| | | |
|---|---|---|
| Michigan Fire & Marine Insurance Company | 5/16 | $ 485.98 |
| California Insurance Company | 1/4 | 388.79 |
| Royal Insurance Company Ltd. | 3/16 | 291.59 |
| Westchester Fire Insurance Company | 1/8 | 194.39 |
| Eagle Star Insurance Company Ltd. | 1/8 | 194.39 |
| | | $1,555.14 |

The detailed computation of the damages allowed on account of the four cars of smoke damaged corn and the 800 bushels of burned corn appears in the footnote.*

The Court has already indicated that the task of determining the amount of damages which proximately resulted from the fire of March 31st presents many practical difficulties. The results above indicated, however, have been reached after resolving all doubts against the plaintiff where the evidence is indefinite and uncertain. The recoverable sum may be too low, or it may be too high, but it reflects the Court's best judgment after a careful and rather exhaustive consideration of the entire problem.

Findings of fact and conclusions of law consistent herewith may be presented on five days' notice. An exception is reserved to each and every party aggrieved by this order.

---

*Car No. 36032 — 60,000# 1,071 bu. at 50¢

Value of No. 1 corn on March 31st ................................... 66¢ less 10 1/2¢ cwt.
Plaintiff received ...................................................... 50¢

 Loss ......................... 16¢ bu. less 10 1/2¢ cwt.
1,071 x 16¢ equals total price loss of............. ............. $171.36, less 10 1/2¢ cwt.
60,000 x 10 1/2¢ equals freight ticket value....... .............. 63.00 (10 1/2¢ cwt.)
100 Loss recoverable .................................................... $108.36

Car No. 5425 — 60,000# 1,071 bu. at 42¢ less 10 1/2¢ cwt.

Value of No. 1 corn on March 31st.................................... 66¢ less 10 1/2¢ cwt.
Plaintiff received ...................................................... 42¢ less 10 1/2¢ cwt.

 Loss ......................... 24¢
1,071 bu. x 24¢ equals recoverable loss of...................................................... 257.04

Car No. 15072 — 66,000# 1178–32 bu. at 42¢ less 10 1/2¢ cwt.

Value of No. 1 corn on March 31st ................................... 66¢ less 10 1/2¢ cwt.
Plaintiff received ...................................................... 42¢ less 10 1/2¢ cwt.

 Loss ......................... 24¢
1178 bu. x 24¢ equals recoverable loss of...................................................... 282.72

Car No. 132453 — 80,000# 1428 bu. at 42¢ less 10 1/2¢ cwt.

Value of No. 1 corn on March 31st ................................... 66¢ less 10 1/2¢ cwt.
Plaintiff received ...................................................... 42¢ less 10 1/2¢ cwt.

 Loss ......................... 24¢
1428 bu. x 24¢ equals recoverable loss of.................................................... 342.72
 Total recoverable loss for smoke damaged corn............................ $990.84

---

800 bushels of burned corn at 66¢ ........................................................ $528.00

Less:
56# x 800 bu.
(——————) x 10 1/2¢ cwt. ...................................................... 47.04
100 Value of corn March 31st ................................ $480.96

Received on sale:
800/1129 of $217.56, or ........................................................ 154.16
 Total recoverable loss for burned corn................................. $326.80